

FILED
ENTERED
RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD

DEC 2 1 2020

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:                              DEPUTY

Joshua Lerner
6725 Abruzzi Dr Unit 102
North Las Vegas, NV 89084
Joshua.Lerner@Live.com
T: (702) 370-9801

# UNITED STATES DISTRICT COURT

## DISTRICT

## 2:20-cv-02304-APG-VCF

Joshua Lerner,

   Plaintiff,

  v.

ADESA NEVADA, LLC
D/B/A/ADESA LAS VEGAS,
a Nevada limited liability corporation;
KAR AUCTION SERVICES INC,
an Indiana Corporation;
ADESA CORPORATION, LLC
an Indiana limited liability subsidiary
corporation;
DOES I thru V, inclusive; ROE
CORPORATIONS
I thru V, inclusive

   Defendants.

**COMPLAINT**

1. Religious Discrimination
   (Hostile Work Environment)
   In Violation of Title VII
   42 U.S.C. § 2000e-2;
2. Retaliation In Violation of
   Title VII– 42 U.S.C § 2000e-3
3. Violation of Nevada Revised
   Statute § 613.340

**JURY TRIAL DEMANDED**

Plaintiff **Joshua Lerner** (hereinafter "Plaintiff") hereby respectfully files his complaint against Defendants, **ADESA NEVADA, LLC DBA ADESA LAS VEGAS**, **KAR AUCTION SERVICES INC**, and **ADESA CORPORATION, LLC** (hereinafter "Defendants") as follows:

1

## JURISDICTION AND VENUE

1.     This Court has jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

2.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties

3.     Venue is proper in, the Unofficial Southern District of Nevada and Defendants are subject to the personal jurisdiction of this Court because Defendants maintain facilities and business operations in this District, and all or most of the unlawful events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## PARTIES

4.     Plaintiff Joshua Lerner resides at 6725 Abruzzi Dr Unit 102 North Las Vegas, Nevada 89084 and was at all relevant times, a resident of Clark County, Nevada

5.     Plaintiff worked as an IT Field Administrator for Defendants, from October 2014 to August 2020

6.     Upon information and belief, Defendant KAR AUCTION SERVICES INC is an international company that directly operates and oversees several wholly owned and operated subsidiaries under various names and aliases. One of which ADESA CORPORATION LLC, operates 75 auction locations throughout North

2

1  America employing approximately 11,000 individuals. Defendant KAR AUCTION
2  SERVICES INC operate an ADESA auto auction in Las Vegas, Nevada, and all or of
3  the events alleged herein occurred while Plaintiff was employed by Defendants in the
4  ADESA LAS VEGAS location

5      7.    ADESA NEVADA LLC D/B/A ADESA LAS VEGAS was, at all
6  relevant times, an employer, as defined under Title VII of the Civil Rights Act of
7  1964, 42 U.S.C. § 2000e et. seq.

8      8.    ADESA CORPORATION LLC was, at all relevant times, an
9  employer, as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §
10 2000e et. seq.

11     9.    KAR AUCTION SERVICES INC was at all relevant times, an
12 employer, as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §
13 2000e et. seq.

14     10.   At all times relevant herein, Defendants KAR AUCTION SERVICES
15 INC, ADESA CORPORATION LLC, ADESA NEVADA, D/B/A ADESA LAS
16 VEGAS had at least fifteen employees both separately and combined and were
17 therefore an "employer" within the meaning of Title VII.

18     11.   Upon information and belief, Defendant ADESA NEVADA, D/B/A
19 ADESA Las Vegas is subsidiary of ADESA CORPORATION LLC which is wholly
20 owned and operated by KAR AUCTION SERVICES INC

21     12.   Upon information and belief, Defendant KAR AUCTION SERVICES
22 INC is an international company that maintains their corporate office in Carmel,
23 Indiana. KAR AUCTION SERVICES INC, with Defendant ADESA
24 CORPORATION LLC, and ADESA NEVADA LLC, operates the office in Las
25 Vegas, D/B/A ADESA LAS VEGAS, where all or most of the events alleged herein
26 occurred.

27     13.   Defendants KAR AUCTION SERVICES INC, ADESA
28 CORPORATION LLC, and ADESA NEVADA LLC, D/B/A ADESA LAS VEGAS

3

1   are liable for the acts of their agents and employees as set forth below.

2       14.    Upon information and belief, Defendants are the successor employers

3   and/or successors-in-interest to any companies or entities that previously owned,

4   managed, or operated the Las Vegas, Nevada office, including, but not limited to,

5   KAR AUCTION SERVICES INC, ADESA LAS VEGAS LLC, ADESA NEVADA

6   LLC, or ADESA CORPORATION LLC.

7       15.    Plaintiff is informed and believes and thereon allege that at all times

8   relevant herein, Defendant, KAR AUCTION SERVICES, ADESA CORPORATION,

9   ADESA NEVADA D/B/A ADESA LAS VEGAS were responsible in some manner

10   for the occurrences and injuries alleged in this complaint.

11

12                    **NATURE OF THIS ACTION**

13       16.    This is an action brought pursuant to Title VII of the Civil Rights Act

14   of 1964, 42 U.S.C. § 2000 et seq, as amended, (Title VII), and Nevada Revised

15   Statute NRS 613.330

16       17.    Plaintiff Joshua Lerner alleges that Defendants KAR AUCTION

17   SERVICES INC ("KAR"), ADESA CORPORATION LLC ("ADESA"), ADESA

18   NEVADA LLC D/B/A ADESA LAS VEGAS (ADESA NEVADA), collectively,

19   "Defendants"), unlawfully discriminated and retaliated against plaintiff on the

20   basis of his religion and harassed him on the basis of religion and unlawfully

21   terminated his employment on August 1st 2020

22       18.    Plaintiff seeks declaratory relief, compensatory damages, punitive

23   damages, liquidated damages, and costs as remedies for Defendants' violations of

24   his rights.

25

26          **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

27       19.    Plaintiff timely filed charges of discrimination with the United States

28   Equal Employment Opportunity Commission ("EEOC") and On or around October

1    22nd 2020, the EEOC issued Plaintiff a Right to Sue Letter.

2         20.    Plaintiff has timely filed this action and has complied with all

3    administrative prerequisites to bring this lawsuit.

4

5                              **FACTUAL ALLEGATIONS**

6         21.    At all times material to this action, Plaintiff Joshua Lerner was

7    employed by Defendants as an IT Field Administrator in Defendants' ADESA LAS

8    VEGAS location located in North Las Vegas, Nevada.

9         22.    Plaintiff is 40 years of age as of the date of this complaint, and is

10   Jewish

11        23.    Plaintiff was hired by defendants in October 2014, as an IT Field

12   Administrator, and was responsible for managing the day-to-day IT operations at

13   the ADESA LAS VEGAS job site.

14        24.    Prior to being hired, Plaintiff was interviewed by Director of IT Laura

15   Kuebler of KAR, Jay Hinchman General Manager of ADESA LAS VEGAS, Heath

16   Berger Fleet Lease manager of ADESA LAS VEGAS, and Dustin Johnson,

17   Operations Manager of ADESA LAS VEGAS.

18        25.    In or around October 2014, Heath Berger became the supervisor of

19   record for Plaintiff Joshua Lerner

20        26.    Management learned of Plaintiff's religion due to him requesting time

21   off during Jewish high holidays, and subsequent discussions he had with the local

22   HR Partner.

23        27.    Mr. Berger and other members of management routinely engaged in

24   derogatory comments and inappropriate discussions about plaintiffs' religion.

25        28.    For example, on one occasion, Mr. Berger asked Plaintiff "Why didn't

26   you light the Hannukah lights before you left last night, you are a bad Jew".

27        29.    On another occasion, Mr. Berger stated to Plaintiff "You shouldn't be

28   hot in the office as the Jews built the pyramids in Egypt" after confronted about the

                                          5

1   air conditioning not working in the middle of summer.

2       30.     Beginning in or around March 2017 Donna Maniscalco, who was

3   employed by Defendants as an HR Business Partner at the North Las Vegas,

4   Nevada location, frequently engaged in discussions with plaintiff about his religion.

5   Plaintiff believed these conversations were harmless at first. When speaking to

6   Plaintiff in subsequent discussions about his religion Ms. Maniscalco asked,

7   Plaintiff if he believed in Jesus, and Plaintiff told Ms. Maniscalco that Jewish

8   people do not believe that Jesus was the messiah. Ms. Maniscalco then told Plaintiff

9   that there is only one way to heaven and that was through Jesus. At this point

10  Plaintiff felt uncomfortable with this discussion, told Ms. Maniscalco he had an IT

11  incident to work on, and left Ms. Maniscalco's office.

12      31.     In or around early May 2017 Ms. Maniscalco passed Plaintiff in the

13  hallway and asked him to come to her office. During this time Ms. Maniscalco

14  asked Plaintiff if he gave any thought about their discussion about religion in the

15  preceding month. Plaintiff said he did not. Ms. Maniscalco further engaged in

16  conversation about Plaintiff's religious beliefs and told Plaintiff that she was going

17  to send him a bible, so he can better understand. Being that Ms. Maniscalco was in

18  a position of authority at the Las Vegas location as an HR partner, Plaintiff not

19  wanting to get in further discussions or debates about uncomfortable topics left Ms.

20  Maniscalco's office and assumed that she was joking about sending him a bible.

21      32.     On June 1, 2017, Plaintiff received a copy of the King James Bible

22  delivered to his personal address by Amazon.

23      33.     On or around June 2, 2017 Plaintiff was approached by Ms.

24  Maniscalco asking if he received the bible. Plaintiff said he did, and Ms.

25  Maniscalco told Plaintiff to read the bible to find the answers.

26      34.     On or around June 15th, 2017 Plaintiff was again approached by Ms.

27  Maniscalco, who asked if he had read the bible she had sent him. Plaintiff

28  responded that he had not, and Ms. Maniscalco responded, by saying she couldn't

6

1  help Plaintiff if he wouldn't even read what she sent him. This behavior by Ms.
2  Maniscalco made the plaintiff exceedingly uncomfortable as he felt Ms. Maniscalco
3  was attempting to convert him to a different religion

4      35.    On or around June 22, 2017 Plaintiff approached Ms. Maniscalco and
5  told her he would no longer engage in conversations about religion with her and
6  that it made him feel uncomfortable. Due to Ms. Maniscalco's position as HR
7  representative of the site, Plaintiff felt that his employment could be put into
8  jeopardy for disagreeing with Ms. Maniscalco's opinion on religion

9      36.    Starting in May 2017 up until termination, Plaintiff was the subject of
10  a hostile work environment. Plaintiff was the subject of undue scrutiny, harassment,
11  false allegations, and threats that made Plaintiff exceedingly uncomfortable.
12  Actions by both Plaintiff's direct manager Heath Berger, indirect general manager
13  Jay Hinchman, and other members of management created a hostile work
14  environment for Plaintiff.

15      37.    Mr. Berger and his immediate manager Mr. Hinchman often added
16  projects and responsibilities to Plaintiffs workload that were out of scope for the
17  Plaintiff's standard work profile and interfered with the completion of his primary
18  job responsibilities. Plaintiff expressed concern that these additional responsibilities
19  and tasks would put his primary job responsibilities in jeopardy. Mr.Berger and Mr.
20  Hinchman made requests of the Plaintiff such as making sure that all lights were
21  turned off in the VIP Lounge, fans turned off in the auction lanes, and promotional
22  televisions turned on or off at specific times, or days.  While Plaintiff would do his
23  best to complete these activities, these out-of-scope assignments often interfered
24  with his day-to-day responsibilities and made completing these primary
25  responsibilities more challenging and or impossible. For example, the auction had a
26  sale day planned once a week on a Thursday. On these days, plaintiff was
27  responsible for setting up the 8 sale lane computers, audio equipment, and
28  associated televisions. Plaintiff could not load the sales into the computers until 30

1   mins prior to the sale start. The process to load the sales took approximately 3 mins
2   per auction lane. As such plaintiff would often work in a very tight window to
3   ensure all sales were loaded in time for the start of the auction sale. Plaintiff's
4   manager and indirect manager both knew this. Even though Plaintiff's manager and
5   indirect manager knew how long it took the plaintiff to complete these activities,
6   they would often ask Plaintiff to make sure other activities were completed, such as
7   turning a television on, or live streaming an auction on a lobby kiosk during the
8   same period Plaintiff would normally be setting the lanes up for sale. These
9   requested tasks occurred in other parts of the building often several hundred feet
10  away from the sale building and were impossible to complete, without abandoning
11  Plaintiff's primary job responsibilities. As such these side tasks would often go
12  uncompleted, and this would lead to further scrutiny by Plaintiffs manager asking
13  why assigned tasks were not being completed, and often involved Ms. Maniscalco
14  in verbal coaching sessions.
15      38.    In one verbal coaching session with Mr.Berger, Mr. Hinchman, and
16  Ms. Maniscalco, Plaintiff explained that he could not be in multiple locations
17  simultaneously and asked if Mr. Berger or another employee from the team could
18  assist with these items, as Plaintiff would be occupied with time specific sale day
19  activities. Mr. Hinchman responded stating that Mr. Berger would not be doing
20  that, and that Plaintiff had to figure out a way of getting the side tasks done.
21      39.    As a result of said harassment and targeting, Plaintiff felt increasingly
22  uncomfortable and stressed. For example, Plaintiff was often asked to outline what
23  they were working on, and how much time in the day they spent on each project
24  and or IT incident. These requests would happen multiple times a day, every day,
25  via text, email, phone, and in person. If a text, email, phone call, or in person
26  inquiry was not responded to immediately, Plaintiff was reprimanded. Plaintiff was
27  questioned multiple times throughout the day as to why they had not completed a
28  project or incident even though they were not given a deadline. Mr. Berger would

8

1  frequently question Plaintiff's work product in front of other employees, and

2  managers. Plaintiff's direct and indirect manager both went as far as to request

3  weekly project reports highlighting the status and expected time of completion.

4      40.    Plaintiff had always received positive reviews from their peers, and

5  the level of scrutiny they were enduring was unwelcome and unnecessary. As such

6  Plaintiff would question Mr. Berger as to why he was under so much scrutiny.

7  Plaintiff never received a response from Mr. Berger.

8      41.    All of plaintiff's work was entered in the service desk ticketing

9  tracking system as dictated by company protocol, and management had access to

10  this system. Plaintiff's manager as well as other managers had the option of going

11  into the ticketing system to determine the status of projects and tickets but chose

12  not to. These excessive inquires created a situation where Plaintiff was spending

13  more time responding to emails, texts, and phone calls than working on projects

14  and incidents.  This ongoing harassment persisted up to the Plaintiff's termination.

15      42.    On January 20th 2019, plaintiff was sent an email from Mr. Hinchman

16  with a photo attached showing the door to the server room wide open. Mr. Berger

17  was carbon copied on this email. In this email Mr. Hinchman asked Plaintiff "Do

18  you know why the server room was left open as I found it this way Saturday

19  morning?" Plaintiff responded to Mr. Hinchman's email stating that he did not

20  believe he left the server room door open and would review the cameras.  Mr.

21  Hinchman then replied to the email and said "Josh, It was not open to that extent in

22  the picture, I went it to see if anything was going on" Plaintiff, not recalling leaving

23  the server room door open and worried about a potential security issue reviewed

24  surveillance footage. Upon reviewing the security footage, Mr. Hinchman pushes

25  the server room door wide open, walks inside the server room, and then walks out

26  of the server room into the adjacent hallway closing the server room door behind

27  him. Moments later Mr. Hinchman can be seen reopening the server room door. Mr.

28  Hinchman then takes a photo of the server room door being wide open. Moreover,

9

1  when analyzing the video footage plaintiff noticed initially that the door was not

2  fully latched prior to Mr. Hinchman pushing it open and thought there was a chance

3  perhaps plaintiff did not fully secure the door. Upon further review later in the

4  week, Plaintiff confirmed that he did in fact fully secure the door, and the only

5  explanation would be that someone other than the plaintiff left the door in an

6  unlocked state. As such, the email and video evidence show that Mr. Hinchman

7  fabricated the server room door incident, whereby he took a picture of the server

8  room door being wide open, claimed he initially found it in that condition, and

9  subsequently emailed plaintiff, carbon copying his direct manager. Ensuring the

10  security of the server room was under the Plaintiff's primary job responsibilities,

11  and failure to properly secure this critical area could result in Plaintiffs immediate

12  termination. Following this incident, Plaintiff lodged a formal complaint with HR

13  manager Becky Driscoll in February 2019. Shortly thereafter, Plaintiff learned that

14  Mr. Hinchman relocated to another division within KAR.

15       43.    In or around January 2020 during a morning meeting Mr. Berger asked

16  the plaintiff if they had fixed the battery backup in the server room as it was

17  beeping. Plaintiff responded in the affirmative and Mr. Berger stated in front of

18  other managers that plaintiff better make sure that the battery backup does not beep

19  again or there will be consequences.

20       44.    On numerous occasions Plaintiff contacted corporate HR, and upper

21  management to complain about these adverse work conditions. Action and

22  investigations were promised, but the discriminatory behavior continued and got

23  even got worse. The last call to HR about these issues occurred in February of

24  2020. This call was made to corporate HR Becky Driscoll to report a hostile work

25  environment, which included but was not limited to veiled threats by Mr. Berger.

26  Ms. Driscoll stated that they thought the plaintiff was being overly sensitive but

27  agreed to investigate.

28       45.    Plaintiff endured working in this hostile work environment as his

10

1    Fiancé has Multiple Sclerosis, was not working, and he was the sole breadwinner in
2    the household.
3         46.    In April 2020, Plaintiff was sent a letter from the company stating that
4    the office was temporarily closing due to the coronavirus pandemic and the hope
5    was to have everyone back to work June 30th, or sooner" Plaintiff was put on
6    unpaid leave starting April 1st 2020.
7         47.    In July 2020, plaintiff received a phone call from Mr. Berger.  During
8    this phone call Mr. Berger told plaintiff that while the office reopened, Plaintiff's
9    employment would be terminated effective August 1st, 2020. Plaintiff asked why he
10   was being terminated and Mr. Berger did not give a reason. Plaintiff asked why IT
11   Field Administrators were retained at other sites, yet Plaintiff was being terminated.
12   Mr. Berger did not answer the question.
13        48.    On August 1st, 2020 Plaintiff received a termination package in the
14   mail. This termination package included a letter stating that the plaintiff was
15   terminated effective August 1st and did not give a reason for termination. Enclosed
16   in the termination package was a general release that defendants wanted plaintiff to
17   sign in exchange for one month's severance pay. Plaintiff did not return the release.
18   In Late August of 2020, Plaintiff received a phone call from HR manager Becky
19   Driscoll asking if they planned on signing the release. Plaintiff told Ms. Driscoll he
20   had no plans on signing the release. In October of 2020, HR manager Becky
21   Driscoll sent an email to Plaintiff, asking if Plaintiff planned on signing the
22   release. Plaintiff called Ms. Driscoll and told her again that he had no plans on
23   signing the release.
24        49.    Plaintiff has learned that majority of the employees at his site and
25   others were retained or called back to work following the temporary closure.
26   Plaintiff has also learned that most if not all IT Field Administrators at other Adesa
27   locations were called back to work.
28

                                          11

**FIRST CLAIM FOR RELIEF**
Hostile Work Environment, Based on Religion in Violation of
Title VII of the Civil Rights Act of 1964, *as amended*,
42 U.S.C. § 2000e-2(a)

50.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 49, above.

51.     42 U.S.C. § 2000e-2(a)(1) (i.e., section 703 of Title VII) states "it shall be an unlawful employment practice for an employer to: (1) fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

52.     Plaintiff was subjected to a objective and subjective unlawful conduct as alleged in paragraphs 27 through 48, which are reincorporated here by this reference.

53.     The allegations show that Plaintiff clearly opposed Ms. Maniscalco's religion conversion attempts, and as a result his workplace environment became increasingly hostile.

54.     Defendants' demonstrated an ongoing pattern of unlawful discriminatory workplace conduct against Plaintiff because of his religion (Jewish).

55.     Plaintiff was subjected to verbal and written conduct by Defendants' agents and employees, including Mr.Berger, Ms. Maniscalco and Mr. Hinchman Defendants' agents and employees' conduct was not welcomed by Plaintiff.

56.     Defendants' agents' and employees' conduct was undertaken because of Plaintiffs' religion, Judaism.

57.     Management level employees knew, or should have known, of the abusive conduct. Plaintiff provided management level personnel, including Ms. Driscoll with information sufficient to raise a probability of religion-based

12

1   harassment in the mind of a reasonable employer. Moreover, the harassment was so

2   pervasive and open that a reasonable employer would have had to have been aware

3   of it. Indeed, management level employees were themselves complicit in the

4   abusive conduct.

5       58.    Defendants did not exercise reasonable care to prevent harassment in

6   the workplace on the basis of religion and did not exercise reasonable care to

7   promptly correct any harassing behavior that did occur.

8       59.    Defendants' unlawful actions were intentional, willful, malicious,

9   and/or done with reckless disregard to Plaintiff's right to be free from

10  discrimination based on religion

11      60.    Plaintiff is entitled to application of the continuing violation doctrine

12  to all of the violations alleged.

13      61.    As a direct, legal and proximate result of the discrimination, Plaintiff

14  has sustained, and will continue to sustain, lost wages and emotional injuries,

15  resulting in damages in excess of $55000, in an amount to be determined at trial.

16  Therefore, Plaintiff seeks all legal and equitable remedies available at law, in

17  addition to all other damages permitted by law.

18      62.    Defendant's above-referenced acts were grossly malicious, oppressive,

19  and done with the intent to injure Plaintiff. As such, Plaintiff seeks an award of

20  punitive damages in an amount sufficient to punish and deter Defendant from

21  engaging in similar unlawful behavior in the future.

22

23                          **SECOND CLAIM FOR RELIEF**

24                      Retaliation in Violation of Title VII –
                             42 U.S.C § 2000e-3
25

26      63.    Plaintiff incorporates by reference as if fully set forth herein the

27  allegations contained in paragraphs 1 through 62 above.

28      64.    Section 704(a) of Title VII of the Civil Rights Act of 1964, as

13

amended, prohibits employers from discriminating against an employee "because he has opposed any practice ... made an unlawful employment practice by this subchapter...."

65.    Plaintiff clearly opposed Ms. Maniscalco's religion conversion attempts, and as a result his work environment became increasingly hostile.

66.    Plaintiff made informal and formal complaints and or protests to Defendants' agents including Ms. Driscoll about Defendants' unlawful, and discriminatory employment practices.

67.    As a result of Plaintiff's complaints to management, and opposition to Ms. Maniscalco's religion conversion attempts, Plaintiff was subject to a hostile work environment, and ultimately terminated

68.    Defendants' agents and employees took materially adverse actions against Plaintiff, including, issuing disciplinary warnings, harassment, false accusations, threats of termination, reprimands, and actual termination of employment.

69.    Defendants' adverse actions constituted retaliatory workplace harassment.

70.    Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

71.    Plaintiff's termination was unlawful and constitutes retaliation under Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. § 2000e-3

72.    As a direct, legal and proximate result of Defendants' reprisals, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

73.    Defendant's above-referenced acts were grossly malicious, oppressive and done with the intent to injure Plaintiff. As such, Plaintiff seeks an award of punitive damages in an amount sufficient to punish and deter Defendant from engaging in similar unlawful behavior in the future.

14

### THIRD CLAIM FOR RELIEF
Reprisal in Violation of the
Nevada State Law, N.R.S. § 613.340
Barring Workplace Discrimination

74.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1-73 above.

75.   N.R.S. § 613.340 makes it unlawful for an employer to discriminate on the basis of race, national origin, color, religion age, or sexual orientation.

76.   Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on religion.

77.   Plaintiff's complaints were made reasonably and in good faith.

78.   As a result of Plaintiff's complaints, Defendants' agents and employees took materially adverse actions against Plaintiffs, including, but not limited to, issuing disciplinary warnings, false accusations, threats of termination, reprimands by supervisors, and actual termination

79.   Plaintiff's termination was unlawful under NRS 613.330 and constitutes retaliation.

80.   As a direct, legal and proximate result of Defendants' reprisals, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

81.   Defendant's above-referenced acts were grossly malicious, oppressive and done with the intent to injure Plaintiff. As such, Plaintiff seeks an award of punitive damages in an amount sufficient to punish and deter Defendant from engaging in similar unlawful behavior in the future.

15

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.  For a declaration and judgement that Defendants' actions, and practices as alleged herein are unlawful.

2.  Employment discrimination training for all members of ADESA LAS VEGAS management, and KAR AUCTION SERVICES INC HR staff.

3.  For actual damages in excess of $55000

4.  For punitive damages in excess of $15000

5.  For Any other relief, this Court deems just and proper

Dated:  December 18, 2020                    Respectfully submitted,

By:  _____
                    JOSHUA LERNER

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims to which they have a right to a jury trial.

Dated:  December 18, 2020                    Respectfully submitted,

By:  _____
                    JOSHUA LERNER

16